E. M. Kahn & Company v. Commissioner.
E. M. Kahn & Co. v. Commissioner
Docket No. 5649.
United States Tax Court
1945 Tax Ct. Memo LEXIS 76; 4 T.C.M. (CCH) 928; T.C.M. (RIA) 45318; September 28, 1945
*76 S. G. Winstead, Esq., for the petitioner. John W. Alexander, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in the taxes of the petitioner for the fiscal year beginning February 1, 1941, and ending January 31, 1942, as follows: Tax
Deficiency
Income Tax
$ 4,861.16
Declared value excess profits tax
1,625.40
Excess profits tax
10,483.58
$16,970.14
Certain adjustments made by respondent are not contested. The two issues involve the correctness of respondent's determination (1) that the salaries and bonuses paid the president and the vice-president of petitioner were excessive to the extent of $2,387.20; and (2) that rent was allowable in no greater amount than $18,000, and the excess ($21,015) was in fact not rent but rather a distribution of profits. The facts were submitted by three stipulations of fact and by oral testimony and documentary evidence adduced at the hearing. We find the facts as so stipulated and in so far as the facts hereinbelow set forth are not from the stipulation they have been otherwise found from the record. Findings of Fact At all times *77 material to this case the fiscal year of the petitioner was from February 1 to January 31, inclusive. It filed its tax returns at Dallas, Texas, with the collector of internal revenue for the second district of Texas. Petitioner's store was established by E. M. Kahn, as a sole proprietorship in or about 1870, at or near the corners of Main and Elm at Lamar Streets in Dallas, Texas, and from the outset the business prospered. It was incorporated under the laws of the State of Texas in March, 1910, and has continued to operate as a corporation under the laws of the State of Texas. The business consists of a retail clothing store, dealing principally in men's and boys' clothing, hats, shoes and furnishings, and to an extent, in certain lines of women's wear. It is known in the trade as a specialty store. In 1882 E. M. Kahn purchased the three-story building located on the northeast corner of Main and Lamar Streets, Dallas, for a total consideration of $18,000. The land on which the building is situated consists of a 50-foot frontage on Main Street and approximately 65-foot frontage on Lamar Street. In 1920 E. M. Kahn purchased the remaining portion of the present Kahn building, *78 which has a 75-foot frontage on Elm Street and 135 feet on Lamar Street and consisted of a two-story building, for a total consideration of $150,000. The buildings at or about 1920 were joined as one building. E. M. Kahn died in August, 1923, at which time he owned 80 percent of the outstanding stock of petitioner, the other 20 percent having theretofore been given to Laurence S. Kahn (sometimes referred to hereinafter as Kahn), son of E. M. Kahn, and president of petitioner. E. M. Kahn owned other properties at the time of his death, including the building adjoining the Elm Street side of the Kahn establishment. This additional property had a 50-foot frontage on Elm Street, was 100 feet deep. Located thereon was a two-story brick building occupied by "The Store Without a Name." The will of E. M. Kahn disposed of all of his real and personal property, including community property, to four trustees for the benefit of his five children equally, Laurence S. Kahn, Gertrude Hessberg, Dr. I. S. Kahn, Felice Sanger, and Marie K. Weisberg. Under the provisions of the will the surviving widow, Lillie B. Kahn, was given an annual income of $22,000, which, on February 6, 1924, she elected *79 to accept in lieu of one-half of the community property to which she would otherwise have been entitled under the laws of the State of Texas. At his death E. M. Kahn was also the owner of the property occupied by petitioner. Both the property and 75.2 percent of the stock at all times herein material have been held in trust by the trustees. Prior to the death of Lillie B. Kahn in March, 1934, the four trustees were Lillie B. Kahn, Laurence S. Kahn, Alex H. Sanger (husband of Felice Sanger), and Alex F. Weisberg (husband of Marie K. Weisberg)., and since the death of Lillie B. Kahn, the three survivors have continued to act as trustees. In 1925, 4.8 percent of the stock of petitioner owned by the estate was sold to Louie N. Bromberg, who at the same time purchased from Kahn 1.2 percent of the stock owned by the latter individually. During the taxable year beginning February 1, 1941, and ending January 31, 1942, the beneficial owners of the property occupied by E. M. Kahn & Company and the beneficial owners of the stock of E. M. Kahn & Company were: Beneficial
Interest
Beneficial
in property
Interest
occupied by
in stock of
E. M. Kahn
E. M. Kahn
Name
& Company
& Company
Laurence S. Kahn
20%
33.84%
Gertrude Hessberg
20%
15.04%
Dr. I. S. Kahn
20%
15.04%
Felice Sanger
20%
15.04%
Marie K. Weisberg
20%
15.04%
Louie N. Bromberg
6%
*80 The will of E. M. Kahn creating the aforementioned trust provided that: "Should E. M. Kahn & Company desire, after my death, to lease the property now occupied by it as its place of business, the Trustees shall make such lease contract, provided terms can be agreed upon which the Trustees consider reasonable. If terms cannot be agreed upon, they shall be settled by arbitration, the Trustees choosing one arbitrator, E. M. Kahn & Company choosing another, and the two arbitrators choosing a third, the decision of the arbitrators to be conclusive. The lease so settled by arbitration shall begin with the expiration of any lease to E. M. Kahn & Company which may be in force at my death and shall run for a term of ten (10) years. E. M. Kahn & Company, at its option, may, upon giving not less than six (6) months, nor more than eighteen (18) months written notice to the Trustees, cancel any lease, whether made by me or by the Trustees, effective upon the date fixed in such notice." During the years beginning February 1, 1920, and ending January 31, 1941, E. M. Kahn & Company paid the trustees rent in the total amount of $513,996.45 and during the same period had gross sales totaling $21,613,350. *81 The rent expense of E. M. Kahn & Company from 1920 through and including the fiscal year ending January 31, 1945, its gross sales and the percentage of rent expense to gross sales are as follows: Years Ending
Rent
Per Cent of Rent
Total Sales
January 31
Expense
Expense to Sales
for Store
1920
$11,800.00
.809%
$1,329,656.00
1921
18,125.00 *
1.37%
1,321,421.00
1922
24,000.00
2.1%
1,136,732.00
1923
24,000.00
2.4%
1,010,876.00
1924
24,000.00
2.2%
1,090,699.00
1925
24,000.00
2.2%
1,106,972.00
1926
24,000.00
2.0%
1,199,165.00
1927
28,000.00
2.4%
1,183,150.00
1928
36,000.00
2.8%
1,294,022.00
1929
36,000.00
2.8%
1,275,768.00
1930
36,000.00
2.8%
1,274,382.00
1931
35,000.00
3.6%
966,764.00
1932
29,500.00
4.1%
726,345.00
1933
25,250.00
5.1%
496,376.00
1934
18,321.00
3.8%
481,307.00
1935
18,000.00
2.9%
625,841.00
1936
15,000.00
2.1%
705,655.00
1937
15,000.00
1.7%
899,896.00
1938
18,000.00
1.9%
948,299.00
1939
18,000.00
2.1%
844,520.00
1940
18,000.00
2.1%
847,007.00
1941
18,000.00
2.1%
848,497.00
1942
39,015.00
4.0%
975,375.00
1943
39,644.94
4.0%
991,123.39
1944
56,505.38
4.0%
1,412,634.49
1945
66,003.91
4.0%
1,650,097.82
*82 The first new lease since the death of E. M. Kahn was made on October 1, 1926, with Kahn acting as spokesman for the petitioner, while Alex F. Weisberg (hereinafter referred to as Weisberg) represented the trustees. The lease dated October 1, 1926, provided for a fixed rental for five years at the rate of $36,000 per year with the privilege to the lessee to renew at the same rental for another five-year period. The yearly periods in the lease did not coincide with the fiscal year of petitioner, the five-year term running from October 1, 1926, to September 30, 1931. In 1926, the year in which the lease was made, the trust estate spent $57,000 on permanent improvements to the real estate. As heretofore, upon the approaching expiration of the lease dated October 1, 1926, Kahn, representing the petitioner, and Weisberg, representing the trustees, negotiated a new lease to begin on October 1, 1931, for the term of one year providing for an annual rental of $30,000. At the insistence of Kahn that the rent was too high, this lease was cancelled on December 1, 1931, and in lieu thereof *83 a lease dated December 1, 1931, was substituted reducing the rent to $27,000 per year. As in the earlier lease, the December 1, 1931, lease contained the provision giving the lessee the right to renew on the same rental basis at the end of each year for a period of three years. From December 1, 1931, until July, 1932, petitioner paid rent at the rate specified in the lease. Thereafter, at the request of Kahn, petitioner paid rent at the rate of $2,000 per month until January, 1933. Lesser amounts were paid in February and March, 1933, and thereafter until January, 1934, petitioner paid rent at the rate of $1,500 per month. The estate, by a letter dated February 19, 1934, accepted these amounts as in full satisfaction and discharge of all rental payments due, and released petitioner from liability for all delinquencies up to that time. The letter further provided that rent for the then current year should be paid at the rate of $18,000 per year. No formal lease was entered into. By letter dated February 19, 1936, signed by Weisberg and addressed to E. M. Kahn & Company, it was stated that: "This will further evidence our understanding that for the current year of the lease you are *84 paying rent at the rate of FIFTEEN THOUSAND DOLLARS ($15,000.00) per annum." On February 1, 1936, E. M. Kahn & Company entered into a new five-year lease calling for an annual rental payment of $15,000 for the year beginning February 1, 1936, and providing that: "* * * thereafter during the period of this lease the annual rental shall be such amount as may be agreed upon from year to year during the period of the lease between the Lessor and the Lessee. If for any of said years the amount of the rental cannot be agreed upon between said parties, same shall be settled by arbitration, Lessor choosing one arbitrator and Lessee choosing another, and the two arbitrators choosing the third, the decision of the arbitrators to be conclusive." The negotiations, leading to this lease, as in previous instances, were conducted by Kahn for petitioner, and Weisberg for the trust estate. During the first year of this lease, E. M. Kahn & Company spent $53,000 on permanent improvements to the real estate, and taking this into consideration, Kahn and Weisberg agreed on a rental for the fiscal years beginning February 1, 1937, and ending January 1, 1941, at $18,000 per annum. The next lease *85 being the lease herein in question was dated February 1, 1941, and was for a five-year term. Unlike earlier leases which provided for a fixed annual rental, this lease provided that the annual rental payment should be 4 percent of the total gross sales of petitioner during each of the fiscal years involved, and provided further that the lessee had the right to terminate the lease at any time by giving the lessor six months' written notice in advance of its desire to terminate. This lease is still in effect and rent is being paid by petitioner in accordance with the provisions thereof. Neither the trustees nor any officer of E. M. Kahn & Company consulted with any outside leasing expert prior to the date of the lease of February 1, 1941. The information respecting the merits of this type of lease agreement and the percentage base was presented to Kahn and to Weisberg by Morton H. Sanger, secretary and comptroller of the company. He is a graduate of the Wharton School of Finance, University of Pennsylvania, and has been secretary and comptroller of petitioner since 1927. He conducted some research into the problem and placed some reliance on statistics compled by the Harvard School *86 of Business Administration on the "Operating Results of Department and Specialty Stores," which show that for specialty stores doing a sales volume of $500,000 to $1,000,000 per year real estate costs for 1939 were 5 percent. Similar figures show for 1940, 4.7 percent; for 1941, 3.9 percent, but were apparently not available to Morton Sanger at the time of his study. As of the date this lease was made, the volume of business being done by petitioner was at substantially the same level it had been since 1939. It was not until some months after the execution of the lease that any increase in the volume of business was indicated. In the 20 years preceding 1941 some high quality merchandising establishments have moved to locations in Dallas eastward from the vicinity in which E. M. Kahn & Company is located. During all times herein material there has been located at the same intersection as petitioner one of Texas' largest department stores, Sanger Brothers. On August 4, 1923, the Dallas Real Estate Board valued the Kahn building and the building immediately adjoining occupied by "The Store Without a Name" at $334,687. The building occupied by E. M. Kahn & Company has altogether *87 approximately 29,000 square feet of floor space. In May, 1944, one C. H. Dixie purchased, at a cost of $85,000, property located on the southwest corner of Main and Poydras Streets, Dallas, having an 81-foot frontage on Main Street and 100-foot frontage on Poydras, the improvements thereon being one-story and two-story brick and concrete buildings containing 12,324 square feet of floor space. It is located one block east of the Kahn building. In August, 1943, one S. N. Cathey purchased property located at 915-917 Elm Street, Dallas, for $17,500, occupied by a two-story brick and concrete building, comprising 7,500 square feet of floor space. This building is a short distance east of the Elm Street entrance of petitioner. A fair gross return on downtown business property in the city of Dallas, Texas, during the time in question was an amount yielding 10 to 15 percent of its fair market value. The capital stock, surplus of the petitioner, and dividends paid by it from 1932 through January 31, 1942, were as follows: Fiscal Year
Capital
Cash
Ending
Stock
Surplus
Dividends
1/31/31
$400,000.00
$71,162.28
1/31/32
400,000.00
41,399.43
1/31/33
400,000.00
20,735.59
1/31/34
400,000.00
34,176.80
1/31/35
400,000.00
38,366.89
$36,000.00
1/31/36
400,000.00
44,968.51
44,000.00
1/31/37
400,000.00
53,411.97
64,000.00
1/31/38
400,000.00
56,694.51
40,000.00
1/31/39
400,000.00
61,018.06
32,000.00
1/31/40
400,000.00
61,618.91
32,000.00
1/31/41
400,000.00
69,000.00
34,000.00
1/31/42
400,000.00
77,258.62
40,000.00
*88 Weisberg at all times material to this case has been an attorney-at-law practicing in Dallas, Texas. Kahn is 57 years of age. He has been president of petitioner since 1923, and has been identified with the business since 1905. His duties, in addition to those generally required of a president and head of such business, include supervising and buying men's clothing, training of employees, handling the credit phases of the business and public relations. The burden of his duties for the fiscal year ending January 31, 1942, increased over the preceding fiscal year. Louie N. Bromberg is executive vice president of petitioner. He joined the petitioner when E. M. Kahn died. Among his duties are direct supervision of the ladies' department, men's furnishing department, the hat department, and advertising department. Prior to joining petitioner he successfully managed a general store in Mineola, Texas. The burden of his duties for the fiscal year ending January 31, 1942, increased over the preceding fiscal year. Both Kahn and Bromberg are recognized as able specialty store executives. Petitioner customarily fixes salaries of executives at the annual meetings held on the first Tuesday *89 in March. Bonuses were arrived at some time after the end of the fiscal year and were based on ability, performance, and profits. The salaries and bonuses which petitioner paid Kahn and Bromberg during the fiscal years ending January 31, 1937-1942 were as follows: Laurence S. Kahn
L. N. Bromberg
Fiscal Year Ending
Salary
Bonus
Salary
Bonus
1/31/37
$11,000.00
$2,500.00
$11,000.00
$2,500.00
1/31/38
11,000.00
2,500.00
11,000.00
2,500.00
1/31/39
11,000.00
2,200.00
11,000.00
2,200.00
1/31/40
11,000.00
2,200.00
11,000.00
2,200.00
1/31/41
11,000.00
2,500.00
11,000.00
2,500.00
1/31/42
15,000.00
1,000.00
12,200.00
3,800.00
The rental paid by petitioner in the fiscal year beginning February 1, 1941, was fair and reasonable and properly deductible as rental by petitioner. The salaries and bonuses paid by petitioner to Kahn and to Bromberg in the fiscal year beginning February 1, 1941, were fair and reasonable compensation for the services rendered and properly deductible as such by petitioner. Opinion The qualified identity of interest between the lessor estate and petitioner on the one hand and between petitioner's *90 officers and its stockholders on the other prevents the transactions which respondent questions from assuming an arms-length character. An examination of the surrounding circumstances is accordingly required to determine whether the arrangements were nonetheless sufficiently reasonable so that they could have been the result of arms-length dealings. See . In approaching the rental issue, we cannot lose sight of the fact that in all prior years the parties had operated under a lease calling for fixed amounts of rent. The year in issue was the first in which a percentage lease was resorted to. Under all the circumstances, such a device was perhaps the fairest method by which both the estate and the men's and women's apparel business carried on by petitioner could escape the injury of unforeseen developments. [1] That being so, it remains only to consider whether the percentage arrived at was reasonably calculated to return a fair rent to the owners of the property. An examination of the rental figures for the period beginning as far back as 1927 *91 yields certain helpful comparisons. The petitioner's fiscal year was almost coincident with the preceding calendar year so that, in referring to fiscal years for which the figures appear in the findings, the dates are misleading unless we recognize that 11/12ths of each fiscal year fell into the calendar year with the next prior designation. Thus, for example, in referring to fiscal 1928, what is meant in reality includes the last eleven months of calendar 1927. For the fiscal years 1928, 1929, and 1930, petitioner was operating under a fixed rental, the amount of which was not ten percent less than that paid during the year in controversy. [2] In the following year the rental was almost as great, and in that year and each of the three following years the percentage of total sales paid in rent was approximately as high as that fixed by the lease in question. Thus, for seven successive years, including the entire calendar year 1933, the rental arrangements either in total amount or in percentage were not sufficiently at variance with the disputed rental of the tax year in issue to indicate that the latter was unreasonably high. [3]
*92 It is true that for the fiscal years 1935 and 1936 there was a reduction both in the amount and percentage of the rent, and that in 1936 a five-year lease was entered into under which the rental was likewise smaller in both amount and percentage. But it is as reasonable to conclude that during the seven years embraced in that period the rent was unreasonably low, as it is to find that the previous seven years involved rents which were consistently too high. A more realistic estimate would conclude that during the uncertain business years of the middle thirties the parties were diligently and honestly, but not in every case successfully, attempting to reach a figure which would be fair to both sets of interests. Under all the circumstances we conclude that the percentage of gross sales fixed as rent was not excessive. Not only was the percentage itself comparable to that provided in other leases covering similar business but, as we have seen, both the amount of rental paid and the percentage it bore to total sales had some precedent in the experience of prior years. Another way to put it is that the percentage selected, if applied to the gross sales of a year like 1933 or 1934, *93 for example, would have yielded a rent not materially in excess of that paid under the fixed rental lease next preceding that in controversy. The business, it is true, improved after the lease was executed, with the consequence of unprecedentedly large rentals in succeeding periods. But this may not be taken as a sufficient indication of unreasonableness in the year before us. Petitioner had an option of terminating the arrangement upon six months notice. That it may not have done so in subsequent years after the store business had expanded and the rents had increased in proportion cannot in our view affect the early operations under the lease. Whether the rent was fair and reasonable in subsequent years is an issue not now before us. On the facts pertaining to the year in controversy, and under the circumstances shown, we say only that the payments made do not appear to be sufficiently excessive to warrant disallowance. On the issue as to the compensation of officers, there is little to be said. The percentage of increase over prior periods was small, and we have found as a fact that increased duties and responsibilities devolved upon the recipients. It is not clear to what extent *94 the determination with respect to salaries was the result of respondent's approach to the rent issue. At any rate, the discrepancy, if any, between additional services and increased salary is not sufficiently great for us to conclude that the salaries paid were unreasonable to so measurable an extent as to require disallowance. , . Decision will be entered under Rule 50. Footnotes
*. E. M. Kahn & Co. did not occupy all of the space it now occupies until September 1, 1920.↩
1. Cf. .↩
2. Probably some allowance is necessary when comparing fixed rental and percentage leases for the hazardous character of the percentage lease. See, e.g., "Percentage Leases," National Association of Real Estate Boards (1937), p. 7: "Very few occasions occur in which an owner is justified in eliminating the minimum guarantee when making a term commitment. There are however * * * exceptions * * * in case the owner has an opportunity to rent to * * * an outstanding individual tenant of unquestioned financial responsibility and successful merchandising background who will pay a larger percentage on annual sales because of the waiver of the minimum guarantee." ↩
3. Respondent disallowed over half of the rent charged, allowing only $18,000 of the $39,021 claimed.↩